### Catharine Dieffenbach

*v.*

### William Grece.

[Filed February 19th, 1898.]

Upon the facts proven in this case—*Held*, that there is nothing to show the will was the product of undue influence.

On appeal from a decree of the Hudson county orphans court, which admits to probate a paper purporting to be the last will and testament of Christina Trippensee, dated May 31st, 1894.

*Mr. James B. Vredenburgh,* for the appellant.

*Mr. James A. Gordon,* for the respondent.

*Mr. Clarence Kelsey,* for Ernst Trippensee.

The Ordinary.

Christina Trippensee executed two wills, so far as appears by the proofs in this case; one on the 3d of May, 1894, and the other upon the 31st day of the same month. The latter was

ordered to be admitted 'to probate by the decree of the orphans court now in question, and this inquiry, reviewing the correctness of the decree, deals with its validity.

Mrs. Trippensee died on the 8th of June, 1894, in the seventy-second year of her age. She had been twice married; first to John George Steinbromm, who died in 1885, by whom she had one child, the appellant, Catharine Dieffenbach, and second, in 1890, to Ernst Trippensee, a man ten or eleven years her junior, who survives her. She left an estate worth less than $10,000, consisting of a house and two lots on Sherman avenue, in Jersey City, where she lived at her death, valued, with its furniture, at about $2,000; a mortgage for $1,000 upon the house in which her daughter, Mrs. Dieffenbach, lived, on Zabriskie street, in Jersey City, and a promissory note for $6,000, made to her by Niven & Company, for money loaned.

The will of May 3d, 1894, gave the $6,000 note to her daughter, the $1,000 mortgage to her daughter's eldest son, a young man twenty-three years of age, who is blind or partly so, and her household furniture to her husband, and also devised the Sherman avenue property to her husband and daughter; the husband to take it for his life, or until he should remarry, and the daughter to take the remainder in fee; the daughter to pay all taxes and water rents, so that the husband's enjoyment should be free from those charges. It appoints Frederick Dieffenbach, Jr., the nephew of the husband of the appellant, its executor.

The last will, of May 31st, gives the entire estate, real and personal, to the husband of the testatrix for his life, with the remainder to the daughter, and provides that the executor of the will shall have power to sell the real estate if it shall be to the interest of the estate to do so, and if the husband of the testatrix shall be of that opinion, in which case the executor is to invest the proceeds of sale.

In early life Mrs. Trippensee was in religious belief a Lutheran, as were her relatives, but about thirty years before her death she took interest in the Christian Israelites and thereafter worshiped with them. Among them she met Ernst Trippensee, whom she

Dieffenbach v. Grece.

subsequently married. He appears to be a zealous member of that religious sect, and, because of his obtrusive zeal in further-ing its interests, to have been displeasing to his wife's relatives; so displeasing that the marriage led to a temporary estrange-ment between Mrs. Trippensee and her relatives, which later took permanent shape in relations more or less formal and strained.

Trippensee was a carpenter by trade, but did little work after his marriage. He had a small sum of money, with the aid of which, supplementing his wife's income, he and his wife man-aged to live in the lower floor of the Sherman avenue property, the upper floor being let to tenants.

In March, 1894, it developed that Mrs. Trippensee was afflicted with a cancer in the stomach, which soon destroyed her ability to retain food and secure nourishment. She became emaciated, and, as the disease progressed, suffered so much pain that her physician commenced to administer morphine to relieve her. In April it was recognized that it would not be long before further nourish-ment would become impracticable, and she would die of star-vation.

Mrs. Dieffenbach lived about two blocks from her mother, and, during her mother's illness, was as attentive as her home duties and troubles would permit. After a sickness of several weeks, her husband died on the 11th of April, 1894, leaving her with six children, the eldest of whom was the blind son already mentioned. But with all this trouble at home, she saw her mother nearly every day, and frequently sent sepecially-prepared dishes to her.

Trippensee and Dr. Joseph L. Niven bestowed all the other care that the sick woman received. The husband was constantly with her, assiduously and tenderly performing every duty. It is insisted that the proofs demonstrate that the testatrix feared him, but my conclusion upon them is, that the suggestion of fear on her part is true only to the extent that she believed that her hus-band would not approve of any disposition of her property that would not make provision for him during his life. The entire estate was small. He claimed that he was too feeble in health to work, and it appeared to her to be ingratitude, after his devotion

to her, to deprive him of the income of any part of her estate. Her fear was of his disappointment and his possible reproach of her, if she should refuse to give him the income of her estate for his life.

It does not appear what the daughter's means of livelihood were, or that she was so straitened in circumstances, after the death of her husband, as to make a portion of her mother's income of great importance to her. There is no doubt that she desired to share immediately in her mother's estate, but whether that was because of her need, or because of her dislike of Trippensee, or because of both, is indeterminable from the evidence. Possibly she needed the assistance, and that fact contended in the mother's mind with her disposition to provide for her husband as he wished.

In April Dr. Niven resorted to morphine to alleviate the pains Mrs. Trippensee suffered. He commenced by giving her one-eighth of a grain every evening, and after that, as she became more accustomed to the drug and less affected by it, he increased the size and frequency of the dose, reaching two grains a day before she died

On the afternoon of the 3d of May, at about two o'clock, Jacob Kolb, a brother of Mrs. Trippensee, called to see her. He is a Lutheran minister. He had quite vigorously opposed his sister's marriage to Trippensee, and was so offended by it that, for a year or more after the marriage, he did not visit her. When he called, on the 3d of May, he advised his sister that she should make a will, and that her property should be given to Mrs. Dieffenbach, her daughter. Mrs. Dieffenbach was present at this conversation, and took part in it. She says that her mother expressed a wish to make a will, and talked with her uncle about its terms, concluding upon such a will as that which was made that day; that her mother said that Trippensee should be gotten out of the way when the will should be executed, and also that someone should be procured to draw the will.

It appears that immediately after this conversation Jacob Kolb went away, and that about five o'clock in the afternoon Elizabeth Kolb, the wife of another brother of Mrs. Trippensee, with her

daughter, came from New York to the Trippensee house; that
shortly thereafter Trippensee was sent to Dr. Niven's office for
medicine, where he was detained, as though by preconcerted ar-
rangement, for an hour, first in waiting in an ante-chamber for
an audience with the doctor, and then in a long conversation in
which the physician engaged him; that Frederick Dieffenbach,
the nephew of the appellant's husband, who is a New York law-
yer, about that time came to the appellant's house, and the appel-
lant's son William (the blind son) called two gentlemen to his
mother's house to act as witnesses to the will, and that then the
lawyer and witnesses, Mrs. Dieffenbach and her son went to the
house of Mrs. Trippensee, arriving there after Trippensee had
gone to the doctor's. Frederick Dieffenbach then prepared the
will, and it was executed while Mrs. Trippensee was surrounded
by those who were favorable to the claims of her daughter—the
daughter herself, her son, her nephew, her aunt and her cousin,
and two gentlemen who were not unfriendly. These two gentle-
men satisfy me that Mrs. Trippensee appreciated what she was
doing, although she was feeble and in bed. One of them says
that "the only difference that occurred" was that Mrs. Trip-
pensee insisted that Mrs. Dieffenbach should pay the taxes,
remarking that "Ernst had little enough to live on;" that Mrs.
Trippensee urged them to hurry, that Ernst would come, and,
when the work was completed, she "thanked God" that it was
finished.

It thus appears that within a few hours the subject of will-
making was broached and the will became an accomplished
thing, and that, although the will was made under the supervi-
sion and influence of the daughter and her relatives and in the
absence of the husband, the husband was not entirely excluded
from a share in the property.

The will in dispute was made twenty-eight days later.

The disease from which Mrs. Trippensee suffered had then
progressed so far that Dr. Niven had given up all hope of her
recovery, and was prescribing morphine merely to relieve her
from pain. He says that he had increased the dose, so that at
that time she was taking three-quarters of a grain a day, and was

constantly under the influence of the drug. The testimony of other witnesses exhibits that she was generally asleep or in a lethargic condition, but, at the same time, was capable of being aroused to intelligence.

Dr. Romeo F. Chabert, a physician of the highest character and standing, with an experience of many years' practice in his profession, was called by the orphans court, with the assent of all parties to the controversy, to testify touching the effect of morphine upon the human system. He said that in his observation the controlling effect of a dose of morphine passes away in about two hours; that the drug does not accumulate in the system, but, like alcohol, acts temporarily and passes away. He is of opinion that the continuous subjection of the person to its use for months would weaken his other power of resistance to the importunity of others, but he does not think that one-quarter of a grain of morphine, administered every six or eight hours to a woman in pain, would have any influence upon her mind. Of such a case he says that an hour after taking a quarter of a grain she would be in full possession of her mental faculties, and, if wakened ten or fifteen minutes after taking the dose, she would at first be confused, but, the effect passing over, she would be in possession of her mental faculties. The doctor was shown the signature of Mrs. Trippensee to the will in dispute, and was unable to detect any sign of a nervous trembling of the hand, and expressed the opinion that the person who wrote the signature was not at that time under the influence of morphine to any considerable degree.

The will of May 31st was executed in the presence of William Grece, a reputable lawyer of Jersey City, two neighbors, and the husband of Mrs. Trippensee. As has been stated, it differs from the earlier will in that it gives the husband the $6,000 note and $1,000 mortgage as well as the Sherman avenue property, for his life, and thereby is apparently more favorable to him than the earlier will. Trippensee says that on the evening of the 30th of May, a young man named Edward Hirsh came to see him, and that his wife then said : " Ernst, now Edward is here, go round to Mr. Meyers and Mr. Davis to come around here that

something be made, or else they will come and take everything away from me and leave me nothing." He says that he did not then know that the will of May 3d had been made, and that he told her not to worry, that his God would take care of him; that the next morning he offered to go and get Mr. Grece, who is a German, and had theretofore been employed by his wife, and that she appeared to him to be pleased and told him to do so, and that, locking her in the house alone, he ran and asked Mr. Grece to come to her, and then immediately returned home; that ten or fifteen minutes later Mr. Grece followed him and inquired of his wife what she wanted him for, and she replied that she wanted to have a will made; that Mr. Grece, having a place prepared for him to write upon, sent him (Trippensee) to get witnesses for the will, and he went out, leaving Mr. Grece alone with his wife, and found Mrs. Davis, a next-door neighbor, and Elijah V. Meyers, a real estate and insurance agent, both of whom had known his wife and consented to act as witnesses.

Mr. Grece testifies that Mrs. Trippensee said to him: "I want to make my will; will you look out for Ernst? The other will was lost or destroyed, and I have signed some papers recently that Mr. Dieffenbach read to me. They were read to me in English and I didn't understand it, and were read to me in a hurry, and I really don't know what it was that I have signed." He says that he then questioned her as to how she wanted to dispose of her estate, and she told him that she wanted it to go to her husband for his life, and then to her daughter. He says that she appeared to him to understand what she was doing; that she was sick, but conversed with intelligence for three-quarters of an hour while her husband was finding the witnesses; that when the witnesses came, he, Grece, translated the will to her in German, and then asked her if he should make known its contents to the witnesses, to which she replied that he might read it to them, that there was no secret in it, and that he then read the will in English to the witnesses, neither of whom understood German.

It appears that Mrs. Trippensee could speak English with difficulty, but that she understood best when she was addressed in her native language.

Dieffenbach v. Grece.

The formalities required in the execution of the will were duly observed. The witnesses had each known Mrs. Trippensee about six years. They agree that she was very weak when the will was executed, but that she had sufficient strength to raise herself in bed to a sitting posture, take a book on her knee, and sign her name. They thought that she displayed as much intelligence as she had ever before exhibited.

It appears that Trippensee was in the room during the presence of the witnesses, but that he did not do anything, apparent to them, to influence or control his wife's free agency. He did not even assist her to rise when she prepared to sign the will, though, after she had signed, he helped her to lie down again.

It is possible, from the fact the wife was dependent upon him for every attention she received, to the most trivial and menial office, that he may by threats or coercion have dominated her will, but there is no evidence, save in presumption from circumstances, that he essayed in the slightest degree to induce his wife to do that which she would not have done if she had been left to herself. The influence of his kind offices to the suffering dying woman are not to be accounted against him. His presence at the execution of the will and his participation in the production of the instrument are explained by his duty in respect of those offices. Against the necessity of his ministration to the wants of his wife, and his testimony, direct and positive, that he did not coerce her to make the will, his participation in the production of the instrument cannot prevail.

The insistence of Mrs. Trippensee, when the will of May 3d was made, that the taxes upon the Sherman avenue property should be paid by her daughter, and her remark that Ernst had little enough to live on, and her haste to get through the execution of the will before her husband should return from Dr. Niven's, impress me that she was not entirely satisfied that she had treated her husband justly. It may well be that after making that will she meditated upon the patient continuance of her husband's devotion to her, and concluded that the gift of the entire income from her small estate would best emphasize her appreciation and gratitude. Moreover, she may have been in-

fluenced to make the change from the will of May 3d, because that will did not procure from her any more attention from the women who were interested in its production than they had rendered her before it was made.

I am of opinion that Mrs. Trippensee possessed sufficient capacity to make the disputed will, and that it has not been shown that that document is the product of undue influence.

I will affirm the decree of the orphans court.